The CHARTER OAK FIRE INSURANCE COMPANY, Appellant,

v.

Julius HOLLIS, Appellee.

No. 988.

Court of Civil Appeals of Texas, Houston (14th Dist.).

June 26, 1974.

Rehearing Denied July 17, 1974.

Thomas L. Woodall, Charles R. Vickery, Jr., Dewey F. Meadows, Vickery, Brown & Meadows, Houston, for appellant.

Richard P. Hogan, Helm, Jones & Pletcher, Houston, for appellee.

TUNKS, Chief Justice.

This is a workmen's compensation case. The Industrial Accident Board made an award to the workman, Julius Hollis, based on a finding of temporary total and permanent partial disability. The carrier, The Charter Oak Fire Insurance Company, filed suit to set aside that award. Hollis filed a cross-action asking recovery for total and permanent disability. The case was tried before the court, without a jury, and resulted in a judgment awarding Hollis a recovery based on total and permanent disability. No findings of fact or conclusions of law were requested or filed. Charter Oaks has appealed to this Court.

Hollis, aged 60, was employed by Todd Shipyards Corporation as a boilermaker for about twenty years. His duties included testing tanks for leaks. This was done by filling the tanks with air and then pouring water on the outsides of the tanks so that an air bubble would appear where there was a leak. Hollis was also required to weld in the tanks as a repair measure. The tanks were often coated on the inside with a paint which contained poisonous chemicals such as zinc chromate. When applied, this paint would cloud the inside of the tank with a thick dust. The dust would then settle loosely to the bottom of the tank. Masks were often worn by Todd employees to avoid inhalation of the dust. During the twenty-year period Hollis was employed by Todd, he was exposed to these dusty fumes on numerous occasions.

Around 11:00 A.M. on August 24, 1972, Hollis was in the process of filling a tank with air when the air house became disconnected and violently stirred up the sediment at the bottom of the tank in which he was working. He was not wearing a mask and was exposed to the harmful materials for a few minutes. After getting out of the tank he became ill; he was chilled and feverish, and he vomited. He did not go to the first aid station, but laid down during the lunch hour. He continued to work until about 3:00 P.M., when he felt he could no longer continue. He went home at that time, which was about one and a half hours earlier than normal. Later that evening his son took him to the emergency room of a hospital where he was given oxygen and medication. He was released from the hospital after about four hours. The next day he went to the office of Dr. McKay, the family physician. He has not worked since.

In his cross-action Hollis alleged that the "toxic substances inhaled on this occasion and those he was exposed to over his approximately twenty years of employment have had the cumulative effect of injuring him" and rendering him disabled. That is a proper allegation of a compensable injury under the amendment of the Workmen's Compensation Act, effective August 30, 1971, by which Art. 8306, sec. 20, Vernon's Ann.Civ.St., was amended and Art. 8306, secs. 25, 26, and 27 were repealed. Under the amended statute it is no longer necessary to allege and prove either an event traceable to a definite time, place, and cause or a listed compensable occupational disease.

The position of Charter Oaks in this appeal challenges the legal and factual support in the evidence of the trial judge's implied finding that the "injury" alleged by Hollis was a producing cause of his disability. There is no serious dispute of the fact that Hollis is totally disabled. There is medical evidence, though, that he is afflicted with premature arteriosclerosis, thrombophlebitis, and general venous insuf-

ficiency. There is no evidence that any of those afflictions was caused by his inhalation of toxic substances on August 24, 1972, or by the cumulative effect of his inhalation of them in the past. The appellant contends that these afflictions are "ordinary diseases of life," that Hollis' disability is a result solely of them, and is, therefore, not a compensable disability. Thus, the questions in this appeal are whether the evidence is legally and factually sufficient to support the trial court's presumed finding that the alleged compensable injury was a producing cause of Hollis' disability.

Since his exposure to the paint dust on August 24, 1972, Hollis has had signs and symptoms consisting of nausea, vomiting, chills, fever, dizziness, and tightness of the chest. These, according to his testimony, began at the time of his exposure and had continued to the date of the trial. On earlier occasions, in 1966 and in 1969, he had experienced similar symptoms and had been successfully treated for them. On October 6, 1972, he was sent by his employer to Dr. W. M. Wallis, a general medical practitioner. Dr. Wallis found that he had edematous dermatitis of his right leg, varicose veins in both legs, and that "some deep venous thrombosis may be present in right leg also." His final diagnosis was: "1. Stasis type edema and dermatitis right leg due to venous insufficiency. 2. Generalized neurological disease present with patient somewhat unstable on feet." Dr. Wallis sent him back to Dr. McKay for treatment and also sent him to Dr. J. B. Richardson, a dermatologist, for examination.

Dr. Richardson, called as a witness by the appellant, testified that he examined Hollis for his skin symptoms only. The doctor diagnosed Hollis' condition as thrombophlebitis. He expressed the opinion that such condition had no connection with his exposure to paint dust. On cross-examination he was asked if the symptoms of which Hollis complained were the classic symptoms of lead and zinc poisoning, and he answered in the affirmative. He also said, however, that they could be symptoms of thrombophlebitis, which condition he was sure Hollis had.

On December 11, 1972, Hollis went to Dr. Jose Montes for treatment. Dr. Montes, called as a witness by appellant, diagnosed Hollis' condition as premature arteriosclerosis, and he also found that Hollis had an enlarged liver. On cross-examination he testified as follows:

Q Doctor, from the medical standpoint and based on reasonable medical probability do these symptoms speak of someone who has been exposed to a heavy metal poisoning, symptoms such as chills and fever, sweats, excessive perspiration, gastric intestinal problems such as nausea and vomiting, dizziness and vertigo, constriction of the chest and breathing and generalized weakness in the upper and lower extremities, those are symptoms of heavy metal poisoning?

A Yes, sir.

Q The fact that you found an enlarged liver in your examination of Mr. Hollis, I believe one of the things that you noted could cause this was a fume intoxication from toxic substances.

A Yes, sir.

*   *   *   *   *   *

Q Now, heavy metal poisoning can be brought about by inhalation of either fumes or particles in the air?

A Uh huh.

Q By ingesting, by taking it into the mouth, the mucous membrane, the trachea, the esophagus and the entire intestinal system is involved?

A Yes, sir.

Q And by actual exposure of the epidermis or skin contact is made with the foreign substances?

A Yes, sir.

Q  Isn't that true?

A  Yes, sir.

Q  That is based on reasonable medical probability?

A  Uh huh.

Dr. Montes also testified that long exposure to toxic substances in paint could "build up an accumulative factor" in one's body. He said that, while Hollis' symptoms were consistent with heavy metal poisoning, he was never able to determine whether he did or did not have such a. condition because such a determination required a sophisticated blood test, for which he did not have the laboratory or equipment.

There is testimony that before and up to August 24, 1972, Hollis was a capable workman, physically able to perform the duties of his rather strenuous job. He had two other episodes of toxic poisoning, in 1966 and 1969, but he had recovered from the symptoms and disabilities of those episodes. While the evidence indicates that those events may have had a cumulative effect, they were not, just before August 24, 1972, of themselves disabling. The medical evidence also shows that he had arteriosclerosis and thrombophlebitis before that date, but the evidence is susceptible of the construction that those diseases did not produce any disability before the August 24th incident. Then on August 24, 1972, he was exposed to a major inhalation of toxic paint dust. He became immediately ill and immediately developed signs and symptoms which the medical witness said could be caused by heavy metal poisoning. He became disabled at once and was still in such a disabled condition at the time of the trial. It is true that no doctor testified that his disability was "in reasonable medical probability," caused by the August 24th event or by that event and the cumulative effect of prior exposures to toxic dust. It is also true, though, that there began, coincident with that event, signs and symptoms which the medical witnesses said were characteristic of, and in fact were, the "classic" symptoms of heavy metal poisoning. Also, there began, coincident with that event, a total disability, which did not exist before and which continued down to the date of the trial more than a year later.

We hold that the evidence presented a fact question for the trial judge as to whether the alleged injury was a producing cause of the workman's disability and that his presumed finding of such cause was not so against the weight of the evidence as to be clearly wrong. *See* Parker v. Employers Mutual Liability Ins. Co. of Wis., 440 S.W.2d 43 (Tex.Sup. 1969); Colonial Penn Franklin Insurance Co. v. Mayfield, 508 S.W.2d 449 (Tex.Civ. App.—Amarillo 1974, no writ).

In the Parker case, *supra*, the Court discussed at length the evidence which would be sufficient to present a fact question as to causation in a workmen's compensation case. In this discussion the Court said, at page 46 of 440 S.W.2d:

> Secondly, courts present the jury with causation questions when there is a scientific generalization, a sharp categorical law, which theorizes that a result is always directly traceable back to a cause. Where, in other words, the harmful consequences provide a traceable chain of causation back to the act itself. This is the traditional use courts have made of expert testimony. Scientific generalizations of this sort provide the rationale for the "sequence of events" test sometimes used when an injury coincides with a specific point of trauma,  . . . .

The evidence in this case meets the requirement there stated for the presentation of such question. There is medical testimony recognizing heavy metal poisoning, that such can be caused by ingestion of paint fumes and dust, and that long exposure will have a cumulative effect. There is medical testimony that the symptoms displayed by Hollis are characteristic of heavy metal poisoning. There is lay testi-

mony that before August 24, 1972, Hollis was not suffering from disability, that on August 24, 1972, he was exposed to inhalation of paint dust, that with such exposure his symptoms, medically identified as characteristic of heavy metal poisoning, began, and that coincidental with such exposure his disability began (Dr. Wallis' report to the employer stated "Patient appears permanently disabled at present time . . ."). The scientific facts, established by scientific testimony, together with the "sequence of events," established by lay testimony, constituted evidence legally and factually sufficient to sustain the trial judge's presumed finding that the injury alleged was a producing cause of Hollis' disability.

Affirmed.